# LAW OFFICES OF SCOTT E. LEEMON, P.C.
**41 Madison Avenue, 31st Floor**
**New York, New York 10010**
**(212) 696-9111--- Office**
**(917) 238-0880---Mobile**
**scott@leemonlaw.com**
**www.leemonlaw.com**

---------------------------------------------------------------------------

October 6, 2021

<u>Via ECF</u>
Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

     Re:    United States v Joseph Amato, Sr., et al.
            <u>Criminal Docket: 19 CR 442 (S-1) (BMC)</u>

Dear Judge Cogan:

     I write as counsel for Mr. Amato asking the court to impose a sentence of 63 months imprisonment. That sentence, which is within the guideline range, would be "sufficient, but not greater than necessary" to promote the factors of 18 USC § 3553(a). That sentence, at the bottom of the range, also takes into consideration the harsh conditions of pre-trial confinement Mr. Amato has endured during the 2+ years his case has been pending.

     I.     <u>The Plea and Plea Agreement</u>

     On March 22, 2021, pursuant to a written plea agreement, Mr. Amato pleaded guilty to Counts 1 and 5 of the indictment, charging him with Racketeering and the Interstate Stalking of Jane Doe.

     In the Plea Agreement, the Government incorrectly grouped the counts and as a result, an additional one level was added into Mr. Amato's adjusted offense

level.[1] The Probation Department correctly determined Mr. Amato's Adjusted Offense Level as a level 26 prior to the one level reduction for the Global Disposition in this case. As such, his final Adjusted Offense Level is level **25**.

All the parties agree that his Criminal History Category is II.

Thus, the corrected corresponding guideline range for Mr. Amato is 63 to 78 months.

## II. The Conditions at MDC Warrant Consideration

Mr. Amato was arrested on October 3, 2019, and has been detained at the Metropolitan Detention Center ("MDC") since his arrest.[2] He has now been there over 2 years.

The conditions and manner of pretrial detention (and jailing in general) have been forced to significantly modify their operations to try and combat the everchanging and deadly COVID virus from spreading within the institution.

Initially, to try to stop the spread of the virus in the institutions, the BOP reacted by placing all the facilities in a basic locked down condition. Formalizing the policy on April 1, 2020 when they enacted a national 14-day action plan to, among other things, increase social distancing in the facilities. Specifically, inmates in every institution are to be secured in their assigned cells. Since April 13, 2020, the BOP has continued to extend the essence of its April 1, 2020, action plan, making some minor alterations over time.

What this means in the real world is that inmates, initially, were basically locked down in their cells all day. They were no longer free to move throughout the units, watch tv, exercise, use the law library, etc.… For most of the period, approximately three times a week, inmates are let out of his cell for between 15-60 minutes to shower, call their families and use the computers. Lately, they have been let out of the cells on a mostly daily basis, but their movement and timeframe out of the cell is severely limited.

---

[1] AUSA Geddes and I both spoke to Deputy Chief US Probation Officer Mark Gjelaj concerning the multiple count analysis prior to the entry of the plea. The Probation Department and the defense agree that there is only one grouping for all counts of conviction and a maximum of a 5-level enhancement. The Government's analysis (as detailed in the Plea Agreement which they wrote) was and is still incorrect. *See Exhibit A, the Plea Agreement.*

[2] From June 5-8, 2020, on consent, Mr. Amato was briefly released from custody when his mother passed away. He was permitted to attend the funeral and mourn with his immediate family and close friends. While released, he followed all conditions of his release and returned to custody when required.

Further, another significant problem that has recently started to occur more often is the continued lack of adequate staffing. As a result, especially on weekends, the inmates are locked in their cells with no ability to leave.[3]

Additionally, lest we forget the blackouts and reoccurring problems including the lack of heat in the cells during the winter, brown "drinking water", and plumbing issue with the toilets overflowing into the cells. Just to name a few.

MDC has been notorious for the lack of proper medical treatment since its' opening, but the pandemic has brought all these issues to the forefront.

In Mr. Amato's case, I have had to, on numerous occasions, contact either the Government or the legal department at the jail to address the lack of proper medical attention he was provided. Recently, I even had to write the court when the pleas for basic medical treatment were ignored by the jail.

The courts in the EDNY and SDNY have been taking the harsh and unexpected conditions of the MDC when fashioning prison sentences since the pandemic hit. Significant downward variances are regularly being granted to defendant's that have had to endure the hardship of the pandemic behind bars, away from their loved ones. Such consideration is clearly warranted here See generally, *United States v. Edward Rodriguez,* 19-CR-817 (S.D.N.Y. Oct 6, 2020) (Judge Kaplan departing in part because of the MDC's conditions); *United States v. Telemaque Lavidas*, 19-CR-716 (S.D.N.Y. July 2, 2020); (Judge Cote: "[the defendant has suffered [at the MDC], as have other inmates, from the restrictions implemented in response to the pandemic and, mostly recently, in response to a security issue that arose in the institution"); *United States v. Vinas*, 20 Cr 44 (E.D.N.Y. April 20, 2020)(Judge Komitee); *United States v. Piper*, 18 Cr 008 (E.D.N.Y. May 18, 2020)(Judge Donnelly); *United States v Hendryx*, 18 Cr 478 (E.D.N.Y. May 20, 2020)(Judge Vitaliano).

In April 2021, Judge Colleen McMahon, who recently ended her term as the Chief Judge of the Southern District of New York stated the following at the sentencing of Tiffany Days:[4]

> I wish that the Attorney General, whoever, head of the Bureau of Prisons and the leader of the Congress, would have heard that presentation. The single thing in the five years that I was chief judge of this court that made

---

[3] See NY Daily News article, *"Brooklyn federal jailers work 16-hour shifts amid prisoner influx as government shuts Jeffrey Epstein suicide lockup in Manhattan"*, September 3, 2021, annexed as Exhibit B.
[4] See Sentencing Transcript at pages 19-20, *United States v Tiffany Days,* April 29, 2021, 19-CR-619 (CM) attached as Exhibit C.

me the craziest was my complete and utter inability to do anything meaningful about the conditions at the MCC, especially at the MCC and the MDC, two federal correctional facilities located in the City of New York that are run by morons, which wardens cycle repeatedly, never staying for longer than a few months or even a year. So there is no continuity, there is no leadership, there is no ability to get anything done. They lurch from crisis to crisis, from the gun smuggling to Jeffrey Epstein, none of which is the fault of Ms. Days or any of the other inmates I have sentenced or will sentence.

It is the finding of this Court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that.

So if I could, Ms. Days, I would say you've been punished enough, and I would send you home, but I can't. The law doesn't allow me to sentence you to less than five years. Some of what you've endured has been endured by prisoners even in well-run facilities, some of it.

The fact that you haven't been out for a year is a result of the pandemic. Nobody's been out for a year. Nobody's had visitors. People have gotten locked up all over the country in the SHU when they've gotten sick, and you had the great misfortune to not only to get Covid but to get Covid in the earliest days, when we didn't know what we were doing. And that being so, I think you've suffered triply as a result.

But there is no excuse for the conditions in those two institutions. There is no excuse for the serial leadership that does not allow the office of warden to take control and get control of those facilities, that they just cycle through, most of them at the end of their careers, and it is unfair and You shouldn't have to suffer for the incompetence of the United States Department of Justice and its subsidiary agency, the Bureau of Prisons.

    These statements were made before the latest developments for the BOP in the NYC area which included the arrest of an Associate Warden at the MDC for the murder of her husband and BOP's decision to close the MCC and transfer those inmates to the MDC.

    The Bail Reform Act and Sentencing Guidelines were written when the conditions and expectations about the way a person is jailed were very different. These factors should be considered when the court determines the appropriate sentence for Mr. Amato.

### III. Mr. Amato Has Been Productive at the MDC

Since January 2021, Mr. Amato worked as an orderly for Unit Team (kitchen). In this capacity, he helped maintain the kitchen for daily inspection and would help deliver food to the Quarantine Unit, which is located on his floor.

In his latest review, counselor L. Murray stated:

*Inmate Amato is very dependable, works well with his peers. Never a problem. [R]esponsible for feeding over a 100 inmates a day[.] Great job.* (sic)

In addition to working at the MDC, Mr. Amato also earned several certificates from the Recreation and Education Department.[5]

### IV. Personal Letters

I am attaching as Exhibit E, several letters written by friends and family of Mr. Amato.

### V. Conclusion

For the foregoing reasons, the court should respectfully sentence Mr. Amato to 63 months of incarceration.

Thank you.

Very truly yours,

/s/
Scott E. Leemon

cc: All counsel (via ECF)

---

[5] See BOP Work Performance Rating dated April 20, 2021 and related Certificates, annexed as Exhibit E.