

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| EAG | *271 Cadman Plaza East* |
| F. #2018R01021 | *Brooklyn, New York 11201* |

October 14, 2021

**<u>Submitted Under Seal</u>**

<u>By ECF</u>

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Joseph Amato
                  <u>Criminal Docket No. 19-442 (BMC)</u>

Dear Judge Cogan:

      The government respectfully submits this letter in connection with the sentencing of defendant Joseph Amato (the "defendant"), which is scheduled for October 21, 2021. The defendant is an inducted member of the Colombo organized crime family of La Cosa Nostra, and at the time of his arrest in this case, he held the position of captain. In his sentencing memorandum, the defendant seeks a sentence of 63 months' imprisonment, which is at the low-end of the Guidelines range set forth in the Pre-Sentence Investigation Report ("PSR") and below the government's calculation of Guidelines range, as set forth in in the plea agreement between the government and the defendant. In light of the seriousness of the offenses to which the defendant pleaded guilty and the other factors set forth in 18 U.S.C. § 3553(a), the government respectfully submits that the applicable Guidelines range is 70 to 87 months' imprisonment and that a sentence within the Guidelines range determined by the Court is warranted.

BACKGROUND

I.      Defendant's Membership in the Colombo Family

At the time of his arrest in this case, the defendant was an inducted member of the Colombo family and held the position of captain, a position he held for many years. In order to become an inducted member, Amato swore his allegiance for the duration of his life to the crime family above all else, including his own family.

Prior to his arrest, the defendant sponsored multiple Colombo family associates, who were then inducted as full-fledged members, one of whom was co-defendant Thomas Scorcia. The defendant also regularly met with members of his crew. Communications about Scorcia and another individual's ("CC1") induction ceremony (believed to have taken place on December 11, 2018) and the fact of Scorcia's induction were intercepted on cellular telephones belonging to the defendant and Scorcia. For example, on October 12, 2018 (JA1 #343), the defendant called CC1 and told him that he could not say no to Amato's invitation to meet him because "you never know what I mean[,]" which was a reference to the fact that their next meeting could be CC1's forthcoming induction into the crime family. CC1 ultimately received a call about the actual induction on or about December 10, 2018, when the defendant called CC1 and told him the following (JA1 #4425):[1]

> You still (UI[2]) about that job tomorrow morning right? … Yeah okay, so meet me by my (UI) about nine. … Alight he told you what tools to bring and everything right …. Alright very good, we will look at it and if it's good then you know we will go sign a contract, alright.

Later that day, Amato called CC1 again (JA1 #4494),

| Amato: | You should go to bed early. Did you press your clothes? |
| CC1: | Yep. |
| Amato: | You're gonna look like Barzini or what? |
| CC1: | (laughing) Barzini. |
| Amato: | Barzini, I'll see you by my mother's around 9. |

---

[1]      Intercepted communications are assigned a particular session number. Telephone calls and text messages intercepted over the defendant's two cellular telephones are identified as "JA1 #" and "JA2 #"; telephone calls and text messages intercepted over Scorcia's six cellular telephones are identified as "TS1 #," "TS2 #," "TS3 #," "TS4 #," "TS5 #," and "TS6 #"; and telephone calls and text messages intercepted over Amato Jr.'s cellular telephone are identified as "JAJ #."

[2]      "UI" is an abbreviation for "unintelligible."

CC1: You got it.

Barzini is a reference to a fictional character in the movie, "The Godfather." The following day, law enforcement surveilled the defendant, Scorcia and CC1, all of whom were well-dressed, entering Café Di Giorno in Brooklyn, and then Panino Perfetto, where they remained for a few hours and where Scorcia and CC1 are believed to have been inducted into the crime family.

In subsequent telephone conversations between the defendant, Scorcia and others, including one in January 2019, Scorcia and the defendant repeatedly referenced Scorcia's induction. For example, on January 12, 2019 (TS1 #212), the defendant commented, "Yeah, I'm curious tonight with Fanucci," a reference to an inducted member from another crime family. Scorcia then sheepishly said, "Yeah, well, you know, like I says, uh, he knows that you. You don't think he don't know? Of course, he knows," and Amato responded, "A hundred percent. I don't think he'll go there. He may give you a wink or something. You know what I mean?"

In a telephone call between the defendant and Scorcia on March 18, 2019 (TS3 #2388), in which the defendant and Scorcia discussed a funeral for the former official boss of the Colombo family, Scorcia commented, "I ordered a charcoal grey suit, something new. I don't want to be like a stumble bum like everybody else. I represent you. This way we'll be nice and sharp." In that same call, Scorcia also jokingly asked the defendant, after the defendant suggested that Scorcia and codefendant Daniel Capaldo, another Colombo soldier, drive the one-time boss's body back to New York, "Do I move up in the ranks?" Scorcia's comment reflected his status as an inducted member who had the potential to move up in the crime family hierarchy.

II. The Defendant Took Extensive Steps to Evade Detection by Law Enforcement and Promote the Efforts of the Colombo Family

The defendant made extensive efforts to ensure that neither his own illegal actions nor those of his soldiers would be detected by law enforcement. Specifically, Scorcia procured new, prepaid cellular telephones for the defendant, Daniel Capaldo (who also reported to Amato) and himself on a monthly basis (requiring law enforcement to continually identify the new phones and obtain authorization to intercept those communications). In addition, the defendant and his soldiers limited their communications over the phone and used code to avoid detection by law enforcement in the event (as it was) that his telephones were wiretapped.

Some of the crimes committed by the defendant are described below.

III. Cyberstalking by Amato (2016 - 2017)

In November 2016, a GPS tracking device was found on a Metropolitan Transit Authority ("MTA") bus in Staten Island during a routine maintenance inspection: it

3

had been hidden in an oil pan. In fact, the defendant had purchased the device to place a girlfriend, identified herein as Jane Doe, under close surveillance and used the tracking device in an attempt to maintain control over her. To instill fear in Jane Doe, the defendant boasted about the resources at his disposal. In one email obtained during the investigation, he wrote, "This is my island. Not yours. I have the eyes all over[.]" In another, he said, "I'm called a MANS MAN!!! … Anyone could end up in jail. I don't wish it on anyone[.] Especially weak men. Who could never deal with it. I thrived there and anywhere I go." The defendant's surveillance of Jane Doe continued for a period of months and required the defendant to regularly and covertly retrieve the device, charge it and then reposition it on Jane Doe's car. He abandoned the surveillance only after he discovered that the tracker was no longer attached to Jane Doe's car, at which time he reported the device lost to the electronic service provider administering the tracking service. (The device apparently had been discovered by Jane Doe and was placed on the MTA bus, likely to thwart Amato's stalking efforts.)

Undeterred by the discovery of the first device, in May 2017, the defendant obtained a replacement tracking device and again endeavored to place it on Jane Doe's vehicle and surveil her movements. The surveillance, however, was terminated after law enforcement executed a search warrant at the defendant's residence and discovered that he had purchased a second device.

IV. <u>Threats to Assault Bar Employees by Amato, Amato Jr. and Silvestro (December 2018)</u>

In the fall of 2018, a female with whom the defendant was romantically involved accused the defendant of spending time with a different female at a commercial establishment on Staten Island and told Amato that she had seen video footage confirming as much. Thereafter, the defendant dispatched his son, Amato Jr., to threaten employees of the commercial establishment to ensure that they did not further share video footage of the defendant with anyone. Amato Jr. then recruited Silvestro to carry out his father's order.

In a telephone conversation on Friday, December 7, 2018 at 2:14 p.m. (JAJ #965), Amato Jr. told Silvestro, "We might have to go do something quick tonight. … We might have to stop by and talk to someone." Silvestro readily agreed and then they started to plan their approach. First, Amato Jr. asked, "Who do you think we can bring with us? You think we can get three or four kids to come with us?" Silvestro answered, "It depends. What are we trying to do?" Amato Jr. explained that they were going to "[h]ave a serious talk with someone. … but it would be better if like… you know... if a lot of people coming." Silvestro expressed his willingness to engage in violence, asking, "We're beating this [expletive]'s ass or no?" but Amato Jr. said that that was not part of the plan.

4

V. <u>Extortion of Gambling Business Operators by Amato, Amato Jr., Scorcia and Capaldo
(December 2018 - January 2019)</u>

In December 2018, three family members (a father, a son and the son's cousin) were threatening to physically hurt a close friend of Amato Jr. (the "Friend") if the Friend did not make a timely payment on an outstanding gambling debt. On January 5, 2019, at the direction of the defendant and soldiers in his crew, the Friend lured two of the family members, the father and son, to a meeting place by telling them that he was going to pay them. Instead, Scorcia and Capaldo, among others, accosted them and made clear to them that they would not be receiving repayment of the debt.

In one call after the resulting confrontation, which occurred on January 5, 2019 (JAJ #5042), Amato Jr. told his father, the defendant, "They got here they thought they were cowboys and the second (unintelligible) got there they were like church mice. … The second when they got here you know they thought they were nuts and then when we popped out they were like church mice tails between their legs okay no problem no problem." Scorcia and Amato Jr. also exchanged a series of text messages, making clear their pleasure at having intimidated the father and son:

| | | |
|---|---|---|
| Scorcia: | | They got the message good (JAJ #5230) |
| Amato Jr.: | | How embarrassing to get abused like that infront of infront of your son that was great (JAJ #5236) |
| Scorcia: | | His son would have got knocked the f*** out (JAJ #5238) |
| Amato Jr.: | | Forget it! They knew it would be bad if they got stupid I wish he would have said something (JAJ #5240) |
| Scorcia: | | Trust me me too but he was not a butt sorry and apologetic but I just couldn't slap them but I almost seen black and I was just for the fun of It (JAJ #5242) [3] |
| Amato Jr.: | | Extremely apologetic and polite as can be lol (JAJ #5246) |

VI. <u>Conspiracy to Assault Dominick Ricigliano
(January – February 2019)</u>

For the past several years, Scorcia and codefendant Dominick Ricigliano both operated loansharking businesses, and in or about 2017, Ricigliano became upset that Scorcia was operating his business in locations that Ricigliano viewed as his turf. Ricigliano went to Scorcia's office in Brooklyn, New York, where he assaulted Scorcia and vandalized his

---

[3] Scorcia subsequently sent a text message to Amato Jr., suggesting that he wrote this message using the phone's voice to text function and that it was garbled in certain respects.

5

property, and then directed several of Scorcia's loansharking customers to stop paying Scorcia and instead only make payments to Ricigliano. As noted above, in December 2018, Scorcia was inducted into the Colombo family and, upon becoming a full-fledged member of the crime family, Scorcia was determined to retaliate against Ricigliano. Scorcia enlisted several of his codefendants for assistance, including Capaldo, Anthony Silvestro, Krenar Suka and Albert Masterjoseph. He also sought and received the approval of the defendant, to whom he reported in the Colombo family, and without whose approval he could and would not have carried out the plan.

First, on Wednesday, January 30, 2019, Scorcia directed one of their common loansharking customers to tell Ricigliano that he was no longer going to make payments to Ricigliano. On the evening of January 30, 2019, Scorcia and Suka went to the Woodrow Diner in Staten Island where they planned to confront Ricigliano. At 8:06 p.m. (TS2 #1442), Scorcia and Suka called Silvestro and complained that the Woodrow Diner was packed and they were concerned about carrying out the planned confrontation. For example, Silvestro proposed, "I would just wait for the kid to come out the place and grab him before he gets to the car," but Suka said, "It's packed bro, there's so many cars there, there's so many people there." … Bro, I'm telling you, Tommy [Scorcia], tell him it's fucking slammed in there right now." Scorcia echoed, "Fucking packed, people walking out with fucking kids, and like (UI) fucking (UI)." Scorcia then lamented, "I'm fucking, I'm sick to my fucking stomach, I was just gonna walk right in there, but there's fucking people coming out with fucking families." As an alternative, Scorcia offered, "Horrible, he's gonna have to fucking text him, because he text him and say 'Hey I want to meet you we're gonna do something here and there or whatever' and bingo (UI) fucking pop up like that maybe tomorrow afternoon or Saturday morning." A few minutes later, at 8:37 p.m. (TS2 #1447), after Scorcia and Suka had apparently left the dinner, Scorcia and Silvestro spoke again.

| | | |
|---|---|---|
| Scorcia: | | It's a breakfast place, I get in, I'm about to get in the car I said, "fuck it, I'm gonna go in there right now." |
| Silvestro: | | And this rat really parked under the fucking cameras? |
| Scorcia: | | Yeah, 150%, I said, "I'm gonna go in there right now, and walk in, I'm gonna blast (PH) the kid in the face." I says, "motherfucker." |
| Silvestro: | | Yeah, yeah, yeah. |
| Scorcia: | | The mother fucker, the place is packed, (UI) |
| Silvestro: | | Listen, at the end of the day, you can't fucking cannot jeopardize the freedom for fucking some little jerkoff like that you know what I mean |

They then started to make plans for their next attempt. Silvestro said:

> On Saturday, we shouldn't even, we shouldn't even make it a fucking song and a dance, we jump out. … Give him (UI) you send him a smack if he raises his hand back to you we beat the bricks off him, that's it. …That's the bottom line, we're taking his shit, you're giving him your fucking, breaking his shit, punching him and we're out of there.

Scorcia answered, "Exactly. That's what we're gonna do." They agreed to execute the plan on Saturday. Scorcia also updated Capaldo about what had happened:

> Nothing, I just pulled into Woodrow or whatever, I'm gonna head home, I'm gonna head home, and uh, it just didn't work, wasn't good to fucking do the work, you know what I'm saying? Not enough time, whatever, the valves wouldn't hold, lot of fucking people, too many people complaining they would have had no water, so it would have been really, uh, fucked up.

***

> You know, one of the big plumbers that I had with me, not the one you know, the other one, he didn't like it. You know, so, what the fuck was I gonna do? You know? Abort the job? What would we do? We'd have to do OT on the whatever. Alright, I'll talk to you tomorrow then. No worries, all good.

Scorcia, Silvestro, and Masterjoseph attempted to carry out the plan on the following Saturday, February 2, 2019, but the plan was thwarted when they went to Ricigliano's residence and discovered he had cameras installed that could capture their actions on a recording. At 1:15 p.m. (TS2 #2066), Scorcia called Capaldo and asked him to put the defendant on the line.

| | |
|---|---|
| Scorcia: | Oh, alright. So, hear, hear me out, the whatchamacallit, the guy that we have to do the job, off the job for, run all the lines and everything, doesn't uh, was avoiding the kid, doesn't want to meet, doesn't want to start the work, the only way he would meet the kid, to do what they have to do, would be in front of his house. |
| Amato: | They would only meet in front of his house? |
| Scorcia: | Yeah, where he's got, uh, cameras all over it. |
| Amato: | Yeah, alright, stupid, don't worry, don't go over his house, that's for sure, Cuz. |
| Scorcia: | Don't, right? |
| Amato: | No, no, you control the situation. Don't let him control it. |

| | | |
|---|---|---|
| Scorcia: | Yeah. | |
| Amato: | Alright, just leave it alone, leave it until tomorrow, we'll talk, alright. | |

A few minutes later, at 1:27 p.m. (TS2 #2069), Scorcia related to Suka that the defendant had told him to abort the plan: "I just, uh, tried to get permission over there." Scorcia then observed, "That's ridiculous over there by the house. I don't know, but he's [referring to Ricigliano] fucking, (UI) chicken shit, he's got no balls, he's a telephone tough guy, you know that, you know." On Tuesday, February 5, 2019, Scorcia and others tried again to carry out their plan to confront and assault Ricigliano. In a call at 12:44 p.m. (TA2 #2477), Scorcia told Silvestro, "Just give me a heads up what time ya know, this way I can get the other gorilla to come and meet us, from the other day. … Five, 6:00 (UI) later, you tell m-, ya know, what do you think? Wanna get a little darker? Right? … We could do it right in New Dorp too 'cause that's where that kid lives." Law enforcement then warned Ricigliano about the potential assault, causing Scorcia and others to abandon their plan that night.

Notwithstanding law enforcement scrutiny, as evidenced by a call on February 8, 2019 at 1:33 p.m. (TS2 #2987), wherein Silvestro told Scorcia that he had instilled fear in "the kid," an apparent reference to Ricigliano, Silvestro followed through with some form of their plan after all:

| | |
|---|---|
| Silvestro: | I've got the funniest fucking video to show you when I see you. You're gonna pee your pants. |
| Scorcia: | Fuck! I spoke to my buddy, he says he'll let me know, so hopefully it won't be fucking dead. He's fucking scared this fucking kid. You don't think so? |
| Silvestro: | Bro, you have no idea what I did to him. |
| Scorcia: | Motherfucker! Why can't I be there!?!? Motherfucker! (Laughing) Motherfucker. |

## DISCUSSION

I. <u>The Guidelines Calculation</u>

The government agrees with the Guidelines calculation in the PSR with one exception. Specifically, the government submits that the Probation Department conflated the multiple racketeering act analysis, necessary to calculate the adjusted offense level for Count One, with the multiple count analysis, necessary to calculate the total adjusted offense level for Counts One and Five. Because U.S.S.G. § 3D1.4 provides for a maximum increase of five levels, the effect of the Probation Department's approach (also advocated for by the defendant) is that the adjusted offense level for Counts One and Five together does not

8

include the additional one-level increase, as set forth in the government's proposed calculation below.

*Count One:*

R.A. 4: Extortion – John Doe #4

| | |
|---|---|
| Base Offense Level (§ 2B3.2(a)) | 18 |
| Plus: Offense Involved Threat of Bodily Injury | +2 |
| Total: | 20 |

R.A. 6: Extortion – John Doe #5

| | |
|---|---|
| Base Offense Level (§ 2B3.2(a)) | 18 |

Multiple Racketeering Act Analysis (§ 3D1.4)

| | |
|---|---|
| Highest Adjusted Offense Level | 20 |

Units:

| | |
|---|---|
| Racketeering Act 4 (§ 3D1.4(a)) | 1 |
| Racketeering Act 6 (§ 3D1.4(a)) | 1 |
| Racketeering Act 5 (§ 3D1.4(b)) | ½ |
| Racketeering Act 8 (§ 3D1.4(a)) | 1 |
| Racketeering Act 9 (§ 3D1.4(b)) | 1 |
| Racketeering Act 11 (§ 3D1.4(a)) | 1 |
| Total Units: | 5½ |
| Levels Added (§ 3D1.4): | +5 |
| Plus: Defendant Was an Organizer or Leader ((§ 3B1.1(a)) | +4 |
| Adjust Offense Level: | 29 |

*Count Five:*

| | |
|---|---|
| Base Offense Level (§ 2A6.2(a)) | 18 |
| Plus: Offense involved pattern of activity involving stalking, threatening, harassing or assaulting the same victim (§ 2A6.2(b)(2)(e)) | +4 |

9

| | |
|---|---|
| Adjusted Offense Level: | 22 |

*Multiple Count Adjustment (§ 3D1.4)*

| | | |
|---|---|---|
| Highest Adjusted Offense Level | | 29 |
| Units: | | |
|     Count One (§ 3D1.4(a)) | 1 | |
|     Count Five (§ 3D1.4(b)) | ½ | |
| Total Units: | | 1½ |
| Levels Added (§ 3D1.4): | | +1 |
| Less: Global resolution (§5K2.0) | | -1 |
| Total: | | **29** |

      The government submits that the Probation Department should have separately applied the multiple racketeering act analysis pursuant to Application Note One of 2E1.1 and then applied the multiple count analysis pursuant to Section 3D1.4. Such an application is consistent with Section 1B1.1, which provides that in calculating the applicable Guidelines range, first, the base offense level and any appliable adjustments should be calculated (see U.S.S.G. § 1B1.1(a)(1), 1B1.1(a)(2)), next, any applicable adjustments in Parts A, B, and C of Chapter Three should be applied (see U.S.S.G. § 1B1.1(a)(3)), and only then, where, as here, there are multiple counts, should the multiple count adjustment described in Section 3D1.4 be applied. U.S.S.G. § 1B1.1(a)(4). Accordingly, the government respectfully submits that based on a plain reading of the Section 1B1.1, the Court should calculate the Guidelines as set forth above, which includes a five-level increase to determine the adjusted offense level for Count One, and then a second one-level increase under Section 3D1.4 to determine the total adjusted offense level for Counts One and Five together.

II.    <u>A Sentence Within the Applicable Guidelines Range is Warranted</u>

      The government respectfully submits that, in this case, a sentence within the advisory Guidelines range determined by the Court is appropriate in light of all relevant factors, including the nature and characteristics of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

A.      Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 125 S. Ct. 738, 764-65 (2005). However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

B.      Analysis

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence within the Guidelines range is appropriate in this case.

1.      The Nature and Circumstances of the Offense

The defendant has been convicted of very serious crimes: racketeering and interstate stalking. With respect to the racketeering offense, the defendant committed that crime with the backing and support of the Colombo crime family, a violent criminal organization, and relied upon his reputation as a fearsome captain to ensure that the defendant's demands were met. In his position as a captain, the defendant used his subordinates to make money for the defendant and otherwise advance his own interests, all the while approving the use of violence, including the threat of violence, by those subordinates. With respect to the stalking offense, the defendant caused a GPS tracking device to be installed on his then-girlfriend's car and then used the GPS tracking device to surveil his then-girlfriend's movements and try to intimidate her. After the device was detected and removed from the vehicle, he procured another device to attempt to continue to track her movements.
.

2.      The Defendant's History and Characteristics

As discussed above, the defendant's history and characteristics show that the defendant is committed to a life of crime and the crimes to which he pleaded guilty were hardly aberrational. The defendant previously pleaded guilty to serious offenses in

11

connection with the Colombo family, served a lengthy sentence, and then, upon his release, returned to the very crime family that led him to prison.

The defendant's prior convictions and the related periods of incarceration have thus far not only failed to deter him from engaging in future criminal activity, but also failed to deter him from introducing his son (and now co-defendant) into a life of organized crime. As described in the PSR and herein, the defendant regularly included his son in criminal activity connected to the crime family. In so doing, the defendant revealed his utter disregard for the law, his willingness to compromise his own family for the benefit of organized crime, his unwavering investment in a life of crime and his dedication to mentoring and empowering others to engage in violent crime on behalf of the Colombo family.

The defendant has also shown a willingness to personally engage in severe violence in order to protect his reputation as a violent mobster.[4] As described in the detention memorandum, in June 2014, the defendant and his son, Joseph Amato Jr., together with several other members of the defendant's crew, viciously assaulted an individual ("I-1") after I-1 expressed indifference as to the defendant and his reputation on Staten Island. The night before the assault, I-1 tried to intercede after he saw Amato Jr. disrespecting a young woman. In response, Amato Jr. told I-1 that he should mind his own business and when I-1 persisted, Amato Jr. boasted, "Do you know who my father is?" I-1 did not and, as a result, the following day the defendant, Amato Jr. and other members of the defendant's crew tried to send a message to I-1 and others to ensure that the defendant was feared and that he received what the defendant believed was the proper degree of respect. The defendant and his crew lured I-1 to an isolated area and then assaulted him, leaving him with significant head lacerations that required staples.

In sum, the defendant's history and characteristics also support a sentence within the Guidelines range. 18 U.S.C. § 3553(a)(1).

>   3. Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

The sentence must reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the defendant's offenses are serious, in particular because he committed them in connection with his membership in the Colombo family. By engaging in criminal activity in connection with the Colombo family, the defendant has demonstrated an utter lack of respect for the law.

---

[4] The conduct described herein was not included in the PSR. Because it is a relevant fact at sentencing, the government respectfully requests that it be included in the PSR.

4. Affording Deterrence and Protecting the Public

The sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." United States v. Davis, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010).

When the defendant became a member of the Colombo crime family, he took an oath, swearing to remain loyal to this violent criminal organization for the remainder of his life. The government respectfully submits that despite numerous claims to the contrary at sentencing proceedings, aside from those who decide to cooperate against members of the mafia (and therefore are not permitted to maintain a connection to the mafia upon disclosure of their cooperation), few if any members of the mafia give up their connections to the mafia even after serving significant terms of imprisonment. Given the defendant's track record, there is little doubt that he will never abandon his dedication to the crime family and a life of crime.

A sentence within the Guidelines range will, however, at least incapacitate the defendant, thereby protecting the public from further crimes he would otherwise commit during that period of time. Given the need for deterrence and incapacitation, the government respectfully submits that a sentence below the Guidelines range would be insufficient to protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(2)(C).

5. Avoiding Unwarranted Disparities

Finally, a sentence within the Guidelines range is necessary to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

IV. A Fine Within the Guidelines Range Is Warranted

The government also asks the Court to impose a fine. Section 5E1.2(a) of the Guidelines provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." The defendant bears the burden of proving an inability to pay. United States v. Tocco, 135 F.3d 116, 133 (2d Cir. 1998). In this case, the defendant cannot sustain this burden.

In the PSR, the defendant declined to report his employment history and instead simply reported that he had no assets. (PSR ¶¶ 200, 211). In so doing, he failed to disclose that he had incorporated one or more business, opened bank accounts for those businesses and deposited thousands of dollars in cash into those bank accounts. He also failed to disclose that he earned a substantial sum in connection with his position in the Colombo family. As one small example, in the spring of 2017, when a search warrant was executed on the defendant's residence, law enforcement recovered a piece of paper that was

13

consistent with a list of loansharking customers, their outstanding balances and their weekly payments; the paper listed 13 customers who owed a total of $167,100. The government respectfully submits that in these circumstances, the defendant has not carried his burden to show that he cannot pay a fine and the sentence in this case should include a fine within the advisory Guideline range of $25,000 to $250,000. U.S.S.G. § 5E1.2(c)(3).

## CONCLUSION

In this case, given all of the facts and circumstances discussed above, a sentence within the applicable Guidelines range is necessary in order to achieve the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

JACQUELYN M. KASULIS
Acting United States Attorney

By:   /s/
Elizabeth Geddes
Megan Farrell
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (BMC) (by ECF)
Patricia Sullivan (by e-mail)
All Counsel (by ECF)